# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

**Mihaela Lupea,** *individually and on behalf of all others similarly situated*,

Plaintiff,

— *against* —

**Gymshark USA, Inc.,**

Defendant.

No. _____

## CLASS ACTION COMPLAINT

## Jury Trial Demanded

Plaintiff Mihaela Lupea ("Plaintiff"), individually and on behalf of all those similarly situated, brings this action against Gymshark USA, Inc. ("Gymshark"), and alleges as follows:

## INTRODUCTION

1. Gymshark is a popular athletic brand that has built a multi-billion dollar apparel empire on misleading social media marketing strategies that systemically masquerade paid influencer promotion as authentic endorsements of Gymshark products. For years, Gymshark has deceived consumers by enlisting an army of fitness influencers, whom Gymshark locks into exclusive promotional contracts, and instructing them to post Gymshark content without disclosing to consumers that such posts are paid advertisements. Gymshark's marketing strategies are deceptive and unfair—as confirmed by direct guidance and authority from the Federal Trade Commission and social media platforms like Instagram—and they illegally induce consumers to purchase products, and pay higher prices, that they otherwise would not have. Plaintiff brings this class action to seek redress for consumers who purchased Gymshark products after being exposed to influencers who posted promotional content at Gymshark's behest without adequately disclosing their relationship to the brand and the fact that their posts were paid advertisements.

1

2.      Gymshark, which was founded in 2012, is a major athletic apparel brand that targets younger demographics and relies heavily on influencer marketing to drive its growth. Gymshark intentionally, deceptively, and systemically causes paid social media influencers to post advertisements for Gymshark that appear as non-sponsored "organic" social media content. Gymshark engages in this practice to give consumers the false impression that its advertisements reflect influencers' honest and uncompensated opinions, although, in fact, Gymshark pays those influencers for their content and endorsements, and thereby wrongfully induces consumers to buy Gymshark products and/or pay an unmerited premium.

3.      Compounding this deceptive practice, Gymshark also enters into exclusive relationships with influencers, and prohibits them from endorsing, advertising, or wearing competing brands. Not only do many of Gymshark's influencers fail to disclose that they are paid to endorse Gymshark's products, but they fail to disclose that Gymshark prohibits them from endorsing other products. In one notable example, Gymshark sued one of its paid influencers for breaching its sponsorship agreement with Gymshark by promoting a *different* sportswear company even though, for years, that same influencer failed to adequately disclose that he was paid to endorse Gymshark products. As a result, Gymshark has silently captured wide swathes of the fitness influencer social media ecosystem, and caused social media pages for influencers within its ambit to be laden with faux-organic promotions of Gymshark products.

4.      Gymshark's Chief Executive Officer, Ben Francis, has credited influencer marketing for the success of Gymshark's multi-billion dollar valuation. In 2020, Forbes Magazine explained that "Gymshark has become a $1.4 billion-plus (valuation) brand by paying 80 ripped fitness influencers like Levesque," who has more than 1 million followers on Instagram alone, "anywhere

from $6,000 to more than $100,000 per year by *Forbes'* estimate to live—and sell—the Gymshark lifestyle on social media."[1]

5.      The success of Gymshark's guerilla marketing strategy is a product of the fact that its army of "exclusive" influencers do not adequately disclose that they are paid agents of Gymshark. Although Gymshark's influencers have dedicated and considerable audiences of consumers, the influencers that Gymshark targets are typically not household names, and few if any have more than 10 million followers. On information and belief, Gymshark deliberately targets this level of influencer both so that their paid endorsements appear comparatively authentic, and so that Gymshark's practice of orchestrating its influencers' faux-organic paid advertisements is more likely to fly under the radar.

6.      Through these deceptive marketing practices, Gymshark has successfully cultivated an image of authenticity and community—especially with younger and comparatively impressionable demographics—by disguising paid endorsements as organic, personal product recommendations by individuals that consumers are more likely to trust. As a result, Gymshark has been able to wrongfully charge customers a premium for its products, and has convinced customers to purchase products that they otherwise would not have purchased. Gymshark's deceptive acts, including its systemic and deliberate engagement of influencers who do not adequately disclosure their relationships, and its failure to oversee its agent influencers, violates state consumer protection law and has caused Plaintiff and the putative class members millions of dollars in damages in an amount to be proven at trial.

---

[1] Alexander Sternlicht, *How A Former Pizza Hut Delivery Guy Used TikTok and Instagram to Build Gymshark Into A Billion-Dollar Sportswear Brand*, FORBES (Dec. 2, 2020), *available at* https://www.forbes.com/sites/alexandrasternlicht/2020/12/02/how-ben-francis-used-tiktok-and-instagram-to-build-gymshark-into-a-billion-dollar-sportswear-brand/.

3

**PARTIES**

7.      Plaintiff Mihaela Lupea is an individual who resides in Florida. She regularly uses Instagram, where she follows various fitness creators, and is frequently fed algorithmic content posted by fitness influencers whom she does not follow.   In January 2026, she purchased Gymshark products after seeing posts featuring Gymshark attire by multiple influencers she followed, including Whitney Simmons (@whitneyysimmons) and Annabel Lucinda (@Annabel.lucinda). Around that time, Simmons and Lucinda had each posted  faux-organic Gymshark advertisements, examples of which are included in Section III below On information and belief, Simmons and Lucinda are both paid agents of Gymshark who are compensated for promoting Gymshark products. Plaintiff was influenced by the creators' purported recommendations and would not have purchased Gymshark products had she not seen their content. She did not understand that Simmons and Lucinda were being compensated for their content, and believes she would not have subsequently entered the same transactions with Gymshark had she known she had been led to the company through paid endorsements.

8.      Specifically, on or about January 19, 2026, Plaintiff initiated an online purchase on the U.S. Gymshark website (us.checkout.gymshark.com) from her residence in Hollywood, Florida, placing Gymshark Order No. US25631608 for a total of $63.13. After that order was placed, Gymshark informed Plaintiff by email that one or more items were out of stock and refunded the full $63.13 to Plaintiff. Shortly thereafter, Plaintiff completed a follow-up purchase under Gymshark Order No. US25750123 for one (1) pair of "Gymshark Flex High Waisted Leggings, Black," Size Small, at a unit price of $40.00, with $5.00 in shipping, $2.70 in Florida State sales tax, and $0.45 in Broward County tax, for a total of $48.15, charged to Plaintiff's Visa account. The Gymshark order confirmation was sent to Plaintiff's email account, and shipped via Standard Delivery (4 to 7 working days) to her Hollywood, Florida address.

9.      Plaintiff alleges that, had she known, prior to purchase, that the Whitney Simmons and Annabel Lucinda posts that induced her purchase were paid promotions for which Gymshark compensated each influencer in cash, free product, and/or affiliate commissions, Plaintiff would not have purchased the Gymshark products at the prices she paid, or would not have purchased Gymshark products from Gymshark at all.

10.      Plaintiff was also aware of the prices of activewear offered by competing brands through the same online channels. Plaintiff observed that Gymshark's prices were comparable to or higher than competing products but believed that Gymshark's apparent popularity, consumer acceptance, and brand desirability reflected genuine consumer sentiment and organic market demand. Plaintiff would not have paid that price, or would have paid substantially less, had she known that Gymshark's perceived popularity and desirability were materially driven by undisclosed paid endorsements and sponsored influencer content.

11.      Defendant Gymshark USA, Inc. is a Delaware corporation with its principal place of business at 38 Greene Street, New York, NY 10013.  On information and belief, Defendant is a wholly owned subsidiary of nonparty Gymshark Limited, a company incorporated and registered in England and Wales with its headquarters in Solihull, United Kingdom. Defendant is the principal corporation through which Gymshark Limited markets and sells its products in the United States.

## JURISDICTION AND VENUE

12.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

13.     This Court has personal jurisdiction over Gymshark, and venue is proper under 28 U.S.C. § 1391, because, among other things: (i) Gymshark's principal place of business is in New York and in this District; (ii) Gymshark engaged in the misconduct alleged by Plaintiff within this District, including by entering into exclusivity and promotional contracts with influencers from within this district, and by directing influencers' deceptive advertising from within this District; (iii) Gymshark otherwise has substantial contacts with this District and purposely availed itself of the Courts in this District, including by selling its products from New York, selling its products to a substantial number of New York residents, opening "popup" retail stores in Manhattan and opening a "flagship" retail store there in late 2025 (in connection with which Gymshark has hosted certain influencers), and selling and/or shipping products from and to this District; and (iv) Plaintiff, on information and belief, was exposed to deceptive Gymshark promotional content that was directed from this District. Indeed, Gymshark appears to direct all of its American influencer marketing activities from this District, as evidenced by the fact that at least a dozen influencer marketing professionals publicly identify themselves on LinkedIn as being employed by Gymshark in New York.

## FACTUAL ALLEGATIONS

### I.     The FTC Promulgates Guidelines and Regulations Requiring Influencer Endorsement Transparency

14.     The FTC's "Endorsement Guides" require influencers to clearly and conspicuously disclose when they have a material relationship with a brand, including free products, payment, or any other benefits, under 16 C.F.R. § 255.5.

15.     Pursuant to 16 C.F.R. § 255.5, if there is a connection between the endorser and the seller of the advertised product that might materially affect the weight or credibility of the endorsement (i.e., the connection is not reasonably expected by the audience), such connection must

be clearly and conspicuously disclosed.  For instance, the Endorsement Guides explain that where a social media user promotes a product after receiving it for free or at a discount, or receives compensation, commissions, or other incentives tied to sales (such as through affiliate links), the relationship constitutes a material connection that must be disclosed. Likewise, where an individual endorses a product while having a financial interest in the sponsoring company, or where employees or agents of a company promote its products without disclosing their affiliation, such connections must be clearly and conspicuously revealed. The FTC further explains that even seemingly informal or "organic" posts—such as those by influencers, reviewers, or content creators—require disclosure when there is any relationship that could affect the credibility consumers assign to the endorsement. In each of these scenarios, failure to disclose the material connection renders the endorsement misleading.

16.     In December 2019, the FTC also published "Disclosures 101 for Social Media Influencers," which reiterates that influencers must use simple and clear language—such as "#ad," "#sponsored," or "I was paid"—to inform viewers that the post is a paid endorsement. Burying disclosures in hashtags, bios, or "more" links does not comply with FTC guidance.

17.     Despite these laws and guidelines, Gymshark influencers regularly post content promoting the brand without including #ad, #sponsored, or the "Paid Partnership" disclosure tag. In some cases, disclosures are hidden in long captions, placed among hashtags, or omitted altogether.

18.     As recognized by the FTC, "[c]ompanies that use deceptive endorsements and reviews inflict an injurious double whammy. They harm consumers with misleading tactics that subvert their choices at check-out. And they take business away from honest competitors that work hard to comply with the law." By advertising Gymshark products without concern for such disclosure

requirements, Gymshark and the influencers it instructs and controls routinely flout federal guidance and state consumer protection law.

## II.    Gymshark's Business Model

19.    Gymshark is a fitness apparel company that has experienced meteoric growth due in large part to its aggressive and highly calculated social media influencer marketing strategy.

20.    Gymshark was founded in 2012 by Ben Francis, who was then a 19-year-old college student working out of his mother's garage. At that time, Francis provided free products to influencers who had become popular on YouTube. Francis has attributed Gymshark's early success to endorsements from those influencers, who generally failed to acknowledge that they had received free products from Gymshark.

21.    Because Gymshark has few physical stores, it relies primarily on online sales driven through endorsements by social media influencers. Rather than relying on traditional advertising, Gymshark has intentionally built a network of hundreds of paid fitness influencers, including select influencers referred to as "Gymshark Athletes" or "ambassadors," who post photos, videos, and endorsements of Gymshark apparel on Instagram, TikTok, YouTube, and other platforms. Indeed, on its website, Gymshark claims that the "Gymshark family" currently has a "total social media following of over 18 million and customers in over 200 countries." [2]

22.    On information and belief, Gymshark enters into financial arrangements with a broad range of fitness influencers, the terms of which vary depending on the influencer's reach (i.e. the number of followers) and engagement (i.e. the percentage of followers that view or react to the influencer's post). Gymshark often provides influencers with a specific code or link (called an "affiliate link") that influencers can post that tracks that influencer's specific sales. In those cases,

---

[2] The United Nations only recognizes the existence of 195 countries, including 193 Member States and 2 Observer States.

Gymshark provides the influencers with a percentage of the sales they generate. In other cases, Gymshark pays influencers a flat fee in exchange for a specific number of posts or content endorsing their product.

23.     Although Gymshark is not a "household name" retailer, independent analyses of advertisements on social media platforms find that Gymshark is among the top 10 most common brands that are promoted by influencers on Instagram and TikTok, outranking giants like Walmart, Target, and Nike. According to industry analysis and Gymshark's own statements, the brand's success hinges on its portrayal of these influencers as "genuine athletes" or "members of the community" rather than paid endorsers.

## III.    Gymshark and its Paid Influencers Consistently Fail to Disclose Paid Advertisements

24.     Gymshark leverages influencer advertisements extensively on social media platforms like Instagram and TikTok.

25.     Instagram is a widely used social media platform owned and operated by Meta Platforms, Inc. ("Meta"). It allows users to create profiles, share photographs and videos, and engage with other users' content by liking, commenting, and reposting. Users on Instagram can create either public or private profiles. A public profile allows any other Instagram user to view the content, while a private profile limits access to approved followers.

26.     Instagram provides a mechanism for users to post "Stories"—temporary content that disappears after 24 hours (unless saved by the user)—as well as permanent posts on their profile grid. Instagram's platform includes a "Feed" and "Explore" section. The Feed displays content from accounts the user follows, while the Explore page displays algorithmically selected content tailored to the user's engagement history and interests. Instagram also promotes paid advertisements in both a user's Feed and their Explore tool.

9

27.     Instagram allows users to include hashtags in captions and comments to posts. Hashtags are used to categorize content and make it discoverable by other users searching for or following that tag. For example, a user can post a hashtag, signified by the # sign, affiliated with Gymshark by posting #gymshark at the end of a post. A user can also tag Gymshark in a post, video, or even a story, which appears on a post or story as @gymshark instead of #gymshark.

28.     Instagram monetizes its platform primarily through advertising using the Feed and Explore tools. Meanwhile, influencers monetize the platform by attracting a significant following and promoting products on behalf of businesses. Influencers may be compensated or gifted free products directly by businesses like Gymshark that sponsor content, or through the use of affiliate links that compensate influencers for a percentage of the sales that they generate from links in their profiles.

29.     Instagram users who receive compensation—whether monetary payment, free products, commissions, or other benefits—in exchange for posting content that promotes a product or service are legally and contractually required to disclose that relationship in a way that is unavoidable, easy to understand, and placed early in the content (e.g., with terms such as "#ad," "Sponsored," or "Paid Partnership").

30.     Indeed, on top of FTC rules and the requirements of state consumer protection laws, Instagram's Terms of Use require that any "branded content"—which includes any "content that features or is influenced by a business partner for an exchange of value, such as monetary payment or free gifts"—may "only be posted with the use of the branded content tool, and creators must use the branded content tool to tag the featured third party product, brand, or business partner with their prior permission." Instagram has built-in disclosure tools that allows users to tag business partners in a post or Story and signal to viewers that the content is the result of a commercial relationship.

31.     Despite these tools, Gymshark influencers routinely publish content promoting Gymshark without disclosing the associated financial or promotional relationship, thereby misleading the public into believing the endorsement is independent and unbiased.  Gymshark encourages such behavior, in part, because it is cheaper for Gymshark to pay influencers to post stories or posts endorsing Gymshark without disclosures than for Gymshark to purchase advertising space reaching an equivalent number of potential customers using Instagram's platform.

32.     Instagram's algorithm deprioritizes ads that are displayed as Paid Partnerships, resulting in less reach and ultimately less revenue for both Gymshark and the influencer. As a result, Gymshark and its influencers go to great lengths to cover up their paid partnership.

33.     For instance, a review of the most popular posts tagged using #gymshark demonstrates that the overwhelming majority of posts affiliated with the #gymshark tag, fail to adequately disclose a material connection between the influencer and Gymshark. In the example below, two influencers with more than half-a-million combined followers posted a picture in Gymshark clothing, asking their followers to purchase Gymshark clothes using their affiliate link



and code. Their post, however, does not disclose that those influencers are paid by Gymshark or that they receive a kickback for purchases made using their affiliate link.

34.     Numerous posts from another Gymshark influencer, Brittany Lupton, also fail to adequately disclose that she receives compensation from Gymshark in exchange for her endorsements. Lupton is based in Florida and has more than 450,000 followers on Instagram. Example of Lupton's posts and stories are included below:



35.     Examples abound of others of the most popular #Gymshark posts as of July 15, 2025 that do not disclose that Gymshark influencers are paid. Ellacaggfitness, for example, regularly posts

pictures of herself in Gymshark fitness attire and encourages her followers to purchase Gymshark products, but she fails to disclose that she is a paid influencer for Gymshark:



36.     Even where Gymshark influencers disclose their status as paid endorsers of Gymshark products, they generally do so in small print or using text that is easy to miss or that requires followers to click an additional link to see the disclosure.

37.     Nell Grabowski, an influencer with nearly 400,000 followers and who is based in the United States, includes a disclosure that certain of her content is paid by including the #ad hashtag, but users have to click an additional button to see the disclosure and Grabowski routinely fails to use Instagram's "Paid Partnership" tool.

38.     Plaintiff followed a fitness and lifestyle influencer, Annabel Lucinda, who has 3.4 million followers.  On information and belief, at times relevant to this Complaint, Lucinda resided in New York City.  She frequently posts about her fitness experience, while wearing Gymshark clothing.  Her posts are characterized by intimate confessions about her fitness journey, mental health, and her physical appearance.  Nevertheless, she monetizes those highly personal posts through brand relationships with companies like Gymshark.  Even though Gymshark apparently

pays Lucinda to promote its brand and wear its clothing, Lucinda rarely, if ever, includes #ad or any

other disclosure in her posts.  Examples of such posts are below:



39.    Similarly, Plaintiff followed another influencer with 4 million followers, Whitney

Simmons, who also regularly posts veiled advertisements for Gymshark without disclosing whether

she is compensated for her content, and without using advertising hashtags or disclosures. Examples

of such posts are below:



40.    Gymshark employs the same misleading advertising tactics on other social media platforms like TikTok and YouTube. Like Instagram, TikTok also provides settings that allow influencers to disclose whether their posts are sponsored or not. TikTok explains that "when you turn on the content disclosure setting, you'll be asked to indicate what type of content your post contains . . . .  If you're posting branded content on behalf of another business, your post will be labeled as Paid Partnership." TikTok goes on to explain that "[w]hen posting content that promotes a brand, product, or service on TikTok, you *must* turn on the content disclosure setting."[3] As with its advertisements on Instagram, Gymshark influencers consistently do not adequately disclose that they are paid to endorse Gymshark products on those platforms nor use the Paid Partnership setting.

---

[3] TikTok, Promoting a brand, product or service, *available at* https://support.tiktok.com/en/business-and-creator/creator-and-business-accounts/promoting-a-brand-product-or-service.    (emphasis added)

41.     For example, Analisa Cruz, a popular TikTok personality based in New York City who has more than 3.8 million followers, regularly posts TikTok videos promoting Gymshark. Even though, on information and belief, Gymshark compensates her with a remuneration in addition to providing her kickbacks for sales of Gymshark clothing that she generates, a review of her numerous posts promoting Gymshark over the years reveals few, if any, disclosures indicating that the content constituted sponsored advertising or reflected a paid relationship with Gymshark. An example of Cruz's typical post follows.



42.     In short, Gymshark's core marketing strategy is based on deception: it deliberately works to create the illusion that everyday people and fitness professionals genuinely prefer Gymshark products—and prefer it so much that they wear nothing else—when in reality, they are

paid to do so. Influencers post photos and videos tagging @Gymshark, wearing Gymshark products, and using emotionally persuasive captions such as "I only wear Gymshark" or "Best leggings I've found" — with no reference to the fact that they are sponsored, much less that they may be contractually required to exclusively wear Gymshark attire.

43.    These influencers maintain large followings, often exceeding 100,000 to several million followers, allowing their undisclosed advertising to reach tens of millions of potential customers. This failure to disclose creates a false impression of authenticity, leading reasonable consumers to believe that endorsements are the result of independent and unbiased opinions.

## IV.    Gymshark's Competitors' Influencer Marketing

44.    Other brands in the same market as Gymshark consistently offer lower prices, or better quality than Gymshark. For example, Fabletics is regularly identified as a comparator to Gymshark, but it does not appear to rely on influencer marketing.  Yet, in comparisons between the two, commentors have noted that Fabletics provides "high quality" and "without paying $100+ per outfit" as compared to Gymshark.  The same is true for another apparel brand, YoungLA, which has built a customer base through niche positioning and product-focused branding rather than mass influencer amplification.

45.    As a result of Gymshark's influencer marketing campaigns, it can and does frequently charge a premium as compared to competing brands like Fabletics, YoungLA, CRZ, and Halara. But Gymshark's products are of a similar quality, or are inferior to, those of such competitors.  Had Gymshark implemented adequate disclosures such that class members would have understood that posts they had seen from influencers were not honest endorsements, they would have purchased lower-priced alternatives from brands like YoungLA, Fabletics, CRZ, or Halara, or would not have purchased Gymshark goods at the same prices.

**46.**    While more commonly known competitors like Nike and Adidas also using influencer marketing, there is a stark difference in the way these companies—and their paid influencers—act on social media. Nike, for example, requires its influencers to properly disclose the material relationship with the brand by using the "Paid Partnership" label and the "ad" tag and comply with FTC interpretations of the FTC Act, including the Endorsement Guides.



**47.**    A specific, authoritative illustration of proper disclosure in the same activewear and athleisure category appears in the recent 2024 proceeding of the National Advertising Division (NAD) of BBB National Programs concerning SKIMS, a comparable direct-to-consumer apparel brand. SKIMS confirmed to NAD, and NAD confirmed in its decision, that SKIMS requires its paid influencers, by contract and through active monitoring, to include a clear and conspicuous disclosure in each post promoting SKIMS products, in the form of the Instagram "Paid Partnership" label or, at minimum, "#ad" or "#sponsored" placed before the "see more" cut. Other activewear competitors such as Nike, Lululemon, and Adidas similarly require and obtain proper disclosures from their paid

influencers, in compliance with the FTC Endorsement Guides. By contrast, Gymshark and its influencers conduct their endorsement activity without the disclosures that the rest of the industry has accepted as the operative standard.

## V.    Gymshark's Misleading Marketing Tactics Are Deliberate and Systemic

48.    Furthermore, on information and belief, Gymshark either deliberately instructs or encourages its influencers to refrain from disclosing to consumers that the Gymshark content they post are paid advertisements, or Gymshark deliberately fails to train, inform, and ensure that influencers abide by disclosure obligations when Gymshark instructs them to post content.

49.    Gymshark's intentional misconduct is evidenced by, among other things, its regular orchestration of synchronized posts by individual influencers it employs.

50.    For example, on August 28, 2025, Gymshark began selling new "Dipped Waistband" and "Pumper Pants" women's workout apparel. In the few days leading up to that launch date, numerous influencers posted pictures of themselves in Dipped Waistband and Pumper Pants gear and encouraged their followers to purchase the products—all while failing to disclose the fact that, on information and belief, Gymshark had paid and instructed them to post such content. Six such examples from August 24 to August 28 are below, which were posted by influencers that collectively have over 3 million followers on Instagram alone:



51.     Gymshark's intentional misconduct is also evidenced by its public filings in other

litigations. Specifically, in January 2025, Gymshark's parent company sued one of its former

influencers, Nathaniel Massiah, for breaching his contract to exclusively promote Gymshark products. Gymshark alleged that Massiah breached his obligation to refrain from endorsing "any competing brand without the prior written consent of Gymshark." Notwithstanding that Gymshark prohibited Massiah from endorsing competing brands, Massiah's social media posts consistently failed to adequately disclose that he was compensated by Gymshark to endorse its brand, much less that he was prevented from endorsing other brands. That Gymshark went to such great lengths to enforce its restrictive covenants against influencers like Massiah, but failed to ensure that Massiah disclosed his material connections with Gymshark, demonstrates the extent of Gymshark's failures.

## VI.    Gymshark's Practices Deceptively Create and Extract Value

52.    Brands advertise on social media in order to increase the retail value of the products they sell.

53.    The interest of millions of consumers in a product applies an upward price pressure on the product, which creates a new market equilibrium at the higher price that includes the social-media-added value.

54.    The value that undisclosed paid endorsements (disguised as honest use of the product) add to a product is higher than the value that traditional, properly-disclosed social-media advertising adds, for many reasons. Consumers place more value on the honest opinions of trusted figures than on the opinions of paid advertisers; they assume that posts not labeled as paid are authentic, organic recommendations; and Instagram's and TikTok's algorithms surface non-advertising-labeled posts more aggressively through the "Suggested for You," "Explore," and "For You" functions, further inflating the premium Gymshark is able to charge.

55.    As a result, when purchasing Gymshark products, consumers pay a price that includes a portion attributable to the undisclosed advertising. The difference in price is not bargained for by consumers.

**56.** Peer-reviewed academic research confirms these effects. For example, one field-experimental study, estimate that fake or undisclosed-promotional reviews and endorsements (i) make consumers more likely to choose lower-quality products and (ii) reduce consumer welfare by approximately $0.12 for every $1.00 spent. See Sherry He, Brett Hollenbeck, Davide Proserpio and Avi Reshef, The Impact of Fake Reviews on Demand and Welfare, NBER Working Paper No. 31836 (2023). Earlier work by the same researchers, The Market for Fake Reviews, 41 Marketing Science 896 (2022), independently documents the price-inflating effects of undisclosed paid promotion. Accordingly, Plaintiff and the Class Members damages include such price inflation.

## CLASS ALLEGATIONS

**57.** Plaintiff brings this class action individually and on behalf of all members of the following class of similarly situated persons pursuant to Federal Rule of Civil Procedure 23(b)(3), and 23(c)(4):

### Nationwide Class

All residents of the United States and Canada who purchased Gymshark-branded products after being exposed to Gymshark influencer marketing that failed to disclose a material connection between the influencer and Gymshark.

**58.** Excluded from the Class are Defendants and Defendants' subsidiaries, affiliates, officers, directors, and any entity in which Defendants have a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members; and all counsel representing the class. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

**59.** Numerosity: The members of the Class are so numerous that joinder of all Class Members in a single proceeding would be impracticable. According to online estimates, Gymshark's revenues exceeded $800 million in 2024, with nearly half of that revenue coming

22

from the United States. Online estimates suggest that as many as 9 million consumers visit Gymshark's website each month. The class thus has at least one thousand members and joinder of all members is impracticable.

60.    Typicality: Plaintiff's claims are typical of those of the Class because, like all Class members, she purchased Gymshark products as a result of Defendant's uniform, undisclosed influencer marketing practices and was injured by paying a price premium she would not have paid absent those deceptive omissions.

61.    Commonality: Common questions of law and fact exist and are capable of classwide resolution because they arise from Gymshark's uniform, centralized influencer marketing strategy, including: (a) whether Gymshark systematically failed to disclose material relationships with influencers; (b) whether such omissions were deceptive to reasonable consumers; (c) whether Gymshark knew of or directed such practices; and (d) whether the omissions were material and caused consumers to pay a price premium. These issues will be resolved through common evidence, including Gymshark's influencer agreements, marketing policies, and standardized posting practices.

62.    Adequacy: Plaintiff will fairly and adequately protect the interests of the class members. Plaintiff is an adequate representative and has no interests adverse to, or in conflict with, the class that Plaintiff seeks to represent. Plaintiff has retained counsel with experience in handling complex consumer protection class actions of this nature.

63.    Superiority: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The pursuit of numerous individual lawsuits would not be economically feasible for many individual class members, and certification as a class action will

23

preserve judicial resources by allowing the class's common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based upon an identical set of facts.  Adequate notice can be given to Class members directly using information maintained by or accessible to Gymshark.

64.     Predominance. The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Gymshark has engaged in a common course of conduct toward Plaintiff and class members. The common issues arising from Gymshark's conduct affecting class members set out above predominate over any individualized issues. Adjudication of these issues in a single action has important and desirable advantages of judicial economy.

## COUNT I: VIOLATION OF NY GBL 349
### (On behalf of Plaintiff and the Nationwide Class)

65.     Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

66.     The conduct alleged above—including Gymshark's systemic perpetuation of undisclosed faux-organic paid advertisements to consumers through its agent social media influencers—constitutes deceptive and misleading business practices directed at consumers within the meaning of GBL 349.

67.     Gymshark's deceptive conduct was consumer-oriented in that it was part of a broad-based advertising and marketing campaign aimed at the general public, who encountered and relied on misleading content disseminated via digital and social media platforms.

68.     Gymshark's misrepresentations and omissions—including the dissemination of faux-organic paid advertisements that Gymshark impels, and its failure to disclose payments or other compensation to influencers in exchange for endorsing Gymshark products—are material to

24

reasonable consumers in deciding whether to purchase Gymshark products and at what price, and were likely to deceive such consumers.

69. Gymshark's marketing strategy was conceived, directed, and implemented from Defendant's New York headquarters, where Gymshark maintains its principal U.S. operations and personnel responsible for influencer marketing. From this District, Gymshark negotiated and administered influencer agreements, developed and disseminated marketing directives, and orchestrated the undisclosed advertising practices at issue. The deceptive content was directed from and into New York, and consumed by Plaintiff and Class members, including through social media platforms accessed within this District, and resulted in purchases made in New York. Gymshark processes and fulfills consumer transactions through its New York operations, including transactions by Plaintiff and other Class members.

70. Plaintiff and the Class seek statutory damages, actual damages, including because they were deceived into paying a premium for products, as well as restitution, equitable relief, exemplary damages, and attorneys' fees.

## COUNT II: UNJUST ENRICHMENT
(On behalf of Plaintiff and the Nationwide Class)
(Alternative to Count 1)

71. Plaintiff incorporates by reference the preceding paragraphs of this Complaint

72. Gymshark has been unjustly enriched through its deceptive and misleading marketing practices, including by causing consumers to purchase Gymshark products, and to pay a price premium for those products, based on undisclosed paid influencer endorsements.

73. Plaintiff and Class members conferred a direct and substantial benefit on Gymshark by purchasing Gymshark products under circumstances in which Gymshark's conduct was deceptive and misleading. Gymshark knowingly accepted and retained those benefits.

74.     It would be inequitable and unjust for Gymshark to retain the revenues and profits derived from these transactions because they were obtained through materially misleading omissions and unfair practices.

75.     As a direct and proximate result of Gymshark's conduct, Plaintiff and Class members have been injured in an amount to be determined at trial, including the payment of monies that they otherwise would not have paid, or would not have paid at the same price. Plaintiff and the Class seek damages, restitution, disgorgement, and all other equitable relief permitted by law.

## COUNT III: UNJUST ENRICHMENT
(On behalf of Plaintiff and the Nationwide Class)
(Alternative to Count 1)

76.     Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

77.     Gymshark has been unjustly enriched by encouraging their influencers to violate Instagram and other similar platforms' terms of service, which require influencers to adequately disclose material connections to brands. By encouraging influencers to violate those terms, Gymshark avoids the added cost that platforms like Instagram impose on properly disclosed advertisements, which are generally deprioritized and thus cost more to obtain the same reach.

78.     Plaintiff and Class members conferred a direct and substantial benefit on Gymshark by purchasing Gymshark products under circumstances in which Gymshark's conduct was deceptive and misleading. Gymshark knowingly accepted and retained those benefits.

79.     It would be inequitable and unjust for Gymshark to retain the additional cost savings that they netted from encouraging their influencers to bypass platform terms requiring adequate disclosures of material connections.

80.     As a direct and proximate result of Gymshark's conduct, Plaintiff and Class members have been injured in an amount to be determined at trial, including the payment of monies that they

otherwise would not have paid, or would not have paid at the same price. Plaintiff and the Class seek damages, restitution, disgorgement, and all other equitable relief permitted by law.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in their favor and against Gymshark as follows:

A.    Certifying the Class as requested herein, designating Plaintiff as class representative, and appointing Plaintiff's counsel as Class Counsel;

B.    Declaring Gymsharkin violation of each of the counts set forth above;

C.    Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

D.    Awarding the named Plaintiff a service award;

E.    Awarding prejudgment, post-judgment, and statutory interest;

F.    Awarding attorney's fees and costs; and

G.    Awarding Plaintiff and the Class such other favorable relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

81.    Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Respectfully Submitted:          **GREENBAUM OLBRANTZ LLP**

June 15, 2026
New York, New York

Carter Greenbaum
Casey Olbrantz
240 Kent Street
Brooklyn, NY 11222

27

212-732-6837
carter@greenbaumolbrantz.com
casey@greenbaumolbrantz.com

 */s/ Bogdan Enica*
Bodgdan Enica (*pro hac vice forthcoming*)
Access Law Group (Illinois)
20283 State Rd. 7
Boca Raton FL 33498

*Counsel for Plaintiff*

28